

TOM R. CORNISH
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

IN RE:
GARY LYNN BELL                           Case No. 10-80131-TRC
ROBERTA ANN BELL,                        Chapter 7
    Debtors.

RAFAEL VEGA, JR.,
    Plaintiff,

v.                                       Adv. Case No. 10-08033-TRC

GARY LYNN BELL and
ROBERTA ANN BELL,
    Defendants.

## OPINION

  On the 12th day of May, 2011, this matter came on for trial on Plaintiff's adversary

proceeding seeking to have certain debts deemed nondischargeable pursuant to 11 U.S.C. § 523

(a)(2)(A) and (a)(6).   Appearing on behalf of Plaintiff was Gregory G. Meier.   Ron D. Brown

appeared for Defendants.   After trial of this matter, the parties each submitted proposed findings of

fact and conclusions of law.   The Court then took this matter under advisement.   This Court has

jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Based upon the facts of this case and applicable case law, the Court finds in favor of the Plaintiff. The following constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.

FINDINGS OF FACT

The parties submitted a brief statement of stipulated facts, as follows:

From January 1, 2009, through April 28, 2009, the Plaintiff/creditor was employed by G. R. Bell, Inc. Throughout the same period of time, the Defendants/Debtors were officers of G. R. Bell, Inc., and withheld money from Plaintiff's paycheck for group health insurance premiums. Throughout the same period of time, G. R. Bell, Inc. did not have a group health insurance policy in force and effect, nor had it paid any health insurance premiums in 2009 for group health insurance coverage in 2009.

In addition to these stipulated facts, this Court makes the following findings of fact:

The Defendants, Roberta and Gary Bell, purchased a machine shop in 2007, and incorporated it as G. R. Bell, Inc., ("the Company"). Defendants were the sole shareholders and officers. Defendant Roberta Bell ("Mrs. Bell") had worked as a bookkeeper and accountant for various companies and had also previously been employed in a bank. Her primary duties were to prepare the payroll, including deducting funds for the employee portion of health insurance, as well keeping the books and records of the Company. Defendant Gary Bell ("Mr. Bell") had previous experience as a maintenance machinist. His primary responsibilities were outside sales, shop management, ordering materials and supplies, and consulting with Mrs. Bell regarding finances. Both shared equally in the operation of the business and machine shop. The Company employed less than twenty

employees.

Plaintiff was first employed at the Company as a machinist in the fall of 2008. His salary was $12 per hour. Plaintiff testified that he was hired by Gary and Roberta Bell, but acknowledged that his paychecks were issued by the Company. After working there for a three month probationary period, he became eligible for the company's health insurance in late December or early January of 2009. Mrs. Bell informed Plaintiff of the date he became eligible to be added to the company's health insurance policy. Once Plaintiff became eligible, funds were withheld from his paycheck for the employee portion of the premium.

Originally, Plaintiff believed that he and his wife, Elena Vega, were insured under the Company's group health insurance policy with Community Care. He received an insurance card for insurance with Community Care. Mrs. Vega received medical treatment during early 2009, and submitted the bills for her treatment to Community Care for payment. Although she was uncertain of the date, Mrs. Vega testified that Community Care notified her and Plaintiff that her medical bills would not be paid due to ineligibility at time of service. Mrs. Vega testified that she called Mrs. Bell at the job site to inquire about the rejection by Community Care. Mrs. Bell told her not to worry about it, to ignore it, that the company was changing insurance carriers, and that she would take care of it. Mrs. Vega also testified that she and Plaintiff met with Mrs. Bell at some point in time and presented their unpaid medical bills as well as a letter from Community Care declining coverage. Mrs. Bell took the papers and Mrs. Vega assumed she made copies of them. She assured the Vegas that the bills would be taken care of. Mrs. Vega said she had no reason to doubt Mrs. Bell's assurances. Mrs. Bell denies that she spoke to Plaintiff or Mrs. Vega on these two occasions.

Sometime in February of 2009, a meeting was held in which Mrs. Bell informed the

4

employees that the Company had lost its health insurance. She did not, however, inform them that the insurance was cancelled due to nonpayment of premiums. She told the Court that it was a mistake to withhold insurance premiums from employees' paychecks for February 2009, and that she had simply forgotten that premiums were being withheld. Plaintiff testified that a meeting was held by Mr. and Mrs. Bell during which they told employees that Community Care was too expensive so the Company was changing insurance coverage. He testified that he was not informed that there was no health insurance in effect during February, nor that the insurance was cancelled due to nonpayment of premiums.

Emails introduced into evidence, as well as Mrs. Bell's testimony, indicated that Mrs. Bell was aware that Community Care was going to drop coverage of the Company sometime in January of 2009. An insurance agent was consulted regarding changing plan terms or providers. Since the Company owed Community Care $ 19,262 in premiums at that time, the agent advised that a plan change would require the Company to pay past due amounts to Community Care. He suggested that the Company change providers instead and possibly avoid paying more than $ 10,000 in past due premiums. Mrs. Bell repeatedly testified that Community Care provided insurance for January of 2009, that she was told that the cancellation was not effective until February 1, 2009, and that Plaintiff and his wife were covered in January. She also testified that she made a payment to Community Care in January of 2009, but admitted under cross-examination that this was for past due amounts for December, and that no payments were made to Community Care for 2009 insurance coverage. She also admitted that funds were withheld from Plaintiff's paycheck in January and February for insurance coverage in those months that did not, in fact, exist. When asked why Community Care would decline coverage for Plaintiff's medical bills if, in fact, the Company had

4

insurance in effect during January as she testified, she insisted that she did not know why, and that the bills should have been covered. Evidence admitted showed that the Company owed Community Care at least $10,000 in premiums at the time coverage was terminated, and possibly as much as $ 19,262.

Sometime in March 2009, employees were issued insurance cards through Blue Cross Blue Shield ("BCBS"). On March 31, 2009, Plaintiff experienced what he thought was a heart attack while at work. He was transported by ambulance from the work site to an area hospital. Initially, Plaintiff was told that he had health coverage for the hospitalization but learned that he did not have coverage. Mrs. Vega called Mrs. Bell to report about Plaintiff's condition, and to ask her about the declined insurance coverage by BCBS and workers compensation. Mrs. Vega testified that Mrs. Bell told the Vegas not to worry about the bills, and that she would take care of it. Mrs. Bell did recall speaking to Mrs. Vega on this date, but did not recall any mention that BCBS had declined coverage.

In April, Plaintiff received bills from medical providers due to denial of the insurance claims filed with Community Care because the employer group had terminated December 31, 2008 due to nonpayment. Mrs. Vega called Mrs. Bell to inquire about this. Mrs. Vega testified that Mrs. Bell told her she was working on that and that she would send out a check for the amount owed. Mrs. Vega did not understand exactly what Mrs. Bell meant. Mrs. Bell denied that this conversation took place. Effective April 28, 2009, Plaintiff's employment with the Company was terminated due to insubordination, failure to follow instructions, absences without notice, and misuse of the phone. The Bells objected to Plaintiff's claim for unemployment.

Mrs. Bell testified that all employees were covered by BCBS between March 1, 2009 through June 1, 2009, despite the fact that the Company never paid any money to BCBS for insurance

coverage. Mrs. Bell hoped that Insure Oklahoma, a state program funded by the State Tobacco Settlement, would assist the Company in paying the premiums. She testified that employees signed up for BCBS insurance and Insure Oklahoma sometime in March of 2009. She also stated that the Company had the funds available to pay for the first month's premium of approximately $ 8,000 on March 1, but BCBS agents refused to accept payment because an account for the Company had not yet been set up. Emails from BCBS to Mrs. Bell indicate that BCBS approved coverage on March 18, 2009, retroactive to March 1, 2009, and that premium bills could be paid online. Mrs. Bell stated that the Company also had funds available to make a premium payment to BCBS in April, but that BCBS refused to accept it. She said this was because it was only a partial payment and BCBS required payment in full. Twice over the course of three months Mrs. Bell submitted invoices to Insure Oklahoma to pay, but no funds were ever provided to the Company or BCBS. Mrs. Bell stated that she did not know why such funds were not provided. BCBS's final invoice to the Company was for $ 40,629.60. Mrs. Bell stated that she finally gave up and stopped trying to obtain health insurance for Company employees. BCBS terminated coverage effective March 1, 2009.

Mrs. Bell testified that she did not find out that BCBS had terminated the Company's health insurance until after June 1, 2009, when it declined coverage for a family member who was employed by the Company. Mrs. Bell insisted that BCBS paid all employee health insurance claims between March 1, 2009 through June 1, 2009, including maternity benefits, hospitalization and delivery charges incurred by her daughter and son-in-law (who was a Company employee) for the birth of their child. Mrs. Bell testified that she had to discontinue filling her prescriptions for a couple of months because of the cancellation of health insurance. Once BCBS became the provider, she believed that BCBS paid for her prescriptions filled sometime after March. When asked for

documentary evidence of payment of claims, she said she had not supplied that information to the Court but she could get it. As with Community Care, Mrs. Bell insisted that Plaintiff had health insurance coverage by BCBS from March through the end of his employment, and she had no explanation as to why his bills were rejected but hers and her family's were covered. Both she and Mr. Bell testified that they assumed Plaintiff's bills from March 31 were covered by workers compensation. Plaintiff and his wife testified that none of the medical bills they submitted to the health insurance companies were covered due to ineligibility at time of service, and that their medical bills total $ 12,730.68. The Bells represented that under the BCBS insurance plan each insured member had to satisfy a $ 1,000 deductible.

Mrs. Bell testified that the Oklahoma Labor Board made inquiries about the withholding of insurance premiums from the paychecks of Company employees when no insurance coverage was provided. This prompted her to issue a refund check on June 1, 2009, to Plaintiff for withheld insurance premiums. Insurance premiums totaling $ 762.82 were withheld from Plaintiff's pay during his employment with the Company. However, the refund check issued to Plaintiff was for $ 483.78 to cover premiums withheld from February 1, 2009 through April 28, 2009. When asked why she did not include the premium withheld for January, Mrs. Bell stated that he had insurance for that month so the Company did not owe him for that premium. Plaintiff testified that he never received the first check so he was unable to cash it. When the Labor Board requested proof from Mrs. Bell that employees had been reimbursed, Mrs. Bell stopped payment on Plaintiff's refund check at a cost of $ 50, and reissued him another check. The second check issued to Plaintiff totaled $ 433.76, which was for three months of premiums, less the stop payment charge. Plaintiff did receive this check but never cashed it.

8

The Company contested Plaintiff's application for unemployment benefits. Mrs. Bell wrote to the Oklahoma Appeals Tribunal that "Insurance premium's were reimbursed to employees & ex employees or their medical bills were paid." When asked whether this statement was true with respect to Plaintiff, Mrs. Bell replied that she had not been given any medical bills to pay nor was she asked to pay any of Plaintiff's medical bills.

Both Mr. and Mrs. Bell were paid a salary from the Company. Mrs. Bell testified that their income on their 2009 federal income tax return was $ 67,000. In 2008, they each drew salaries of $ 45,000, but by 2009 Mrs. Bell testified that they only drew paychecks if there was money available. From January through March of 2009, they averaged a monthly salary of approximately $ 7,500. Mrs. Bell told the Court that she always intended to provide health insurance to Company employees, and that she doesn't feel she lied to them. Funds were short so she had to prioritize the bills. She paid utilities and employees first, then she paid critical vendors. She admitted that the Company received a small benefit from withholding premiums without tendering them to pay part of the insurance premiums.

Eventually, the Bells sold the Company. The Company filed bankruptcy in the Northern District of Oklahoma, Case No. 10-11676, on May 19, 2010. That case was closed on September 24, 2010. The Bells filed this Chapter 7 bankruptcy on February 8, 2010. As of that date, Schedule E, Unsecured Priority Claims, lists claims of $ 41,567.17 by the IRS for withholding taxes, $ 523.75 by the Oklahoma Tax Commission, and $ 16,220.56 by the Tulsa County Treasurer. Plaintiff's claim is listed on Schedule F, Unsecured Nonpriority Claims, with the amount unknown. The total for unsecured claims listed on Schedule F is $ 1,015,746.39. Schedule I, Current Income, reflects monthly gross wages of $ 5,027.75 for each Defendant from their employer, Madison Machinery Co.

The Statement of Financial Affairs reflects income of $68,037.48 for 2009, $ 97,664 for 2008, and

$ 81,525 for 2007. Their discharge was entered October 4, 2010. At time of trial, Mrs. Bell was

employed as a bookkeeper for $ 14 an hour. Mr. Bell was unemployed.

<u>CONCLUSIONS OF LAW</u>

Plaintiff seeks a determination that Defendants are personally liable to him for fraud in failing

to maintain health insurance for him, and for the debts he incurred when his medical bills were not

paid due to nonpayment of premiums. He seeks a determination that his medical bills are

nondischargeable under two theories: one is based upon the fraudulent conduct of the Defendants,

pursuant to 11 U.S.C. § 523(a)(2)(A); the other is for willful and malicious injury pursuant to 11

U.S.C. § 523(a)(6). He seeks a judgment of nondischargeability in the amount of $ 12,730.68 for

medical bills, reimbursement of insurance premiums withheld, and punitive damages in an

unspecified amount. Defendants argue that this is a debt of the Company for which they are not

liable individually or as officers or owners. The parties have stipulated that Plaintiff was an

employee of the corporation.

Generally, in a Chapter 7 bankruptcy all of a debtor's preexisting debts are discharged. 11

U.S.C. § 727. However, in accordance with the Bankruptcy Code's basic policy that relief should

only be afforded to the "honest but unfortunate debtor," certain debts may not be discharged if

incurred on the basis of a debtor's fraudulent actions or statements. *Grogan v. Garner*, 498 U.S.

279, 287 (1991). Whether a debt is dischargeable is a matter of federal bankruptcy law, not state

law. *Id.* at 284. A creditor must establish by a preponderance of the evidence that his claim is not

dischargeable. *Id.* at 287. Discharge provisions are to be liberally construed in favor of the debtor

and strictly construed against the creditor. *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*,

125 F.3d 1358, 1361 (10th Cir. 1997).

Plaintiff argues that his claim should be excepted from discharge pursuant to two exceptions listed in 11 U.S.C. § 523(a). These sections prevent the discharge of "any debt." Therefore, the first inquiry is whether there is a debt. Pursuant to the definitions in § 101 of the Code, "debt" is defined as a "liability on a claim," § 101(12), and "claim" is defined as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5). A "right to payment" is "nothing more nor less than an enforceable obligation." *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998) (citations omitted). "Right to payment" has also been defined as "virtually all legal or equitable rights to payment." *Bayless v. Crabtree Through Adams*, 108 B.R. 299, 305 (W.D. Okla. 1989)(citations omitted), *affirmed* 930 F.2d 32. These definitions contain "expansive language" to reflect Congress intent that all possible obligations be included in the definition of a "claim." *See Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 558-59 (1990). Here, Plaintiff filed a proof of claim against Debtors in their bankruptcy, and Debtors listed Plaintiff on Schedule F as an unsecured claim. Plaintiff's claim against Defendants is a tort claim for fraud. Thus, this Court concludes that Plaintiff's tort claim for damages caused by Defendants' fraud, although disputed, constitutes a "claim" and thus a "debt" that may be excepted from discharge under § 523(a).

The next inquiry is whether Plaintiff has met his burden under § 523(a)(2)(A), which provides an exception to discharge "for money, property, services, or an extension, renewal, or refinancing of credit" if such debt was obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." Plaintiff

must prove, by a preponderance of the evidence, that 1) the debtor made a false representation, 2) the false representation was made with the intent to deceive the creditor, 3) the creditor relied upon the false representation, 4) the creditor's reliance was justifiable, and 5) the creditor sustained damages as a proximate result of debtor's representation. *In re Riebesall*, 586 F.3d 782, 789 (10th Cir. 2009) (citations omitted). A finding of whether a requisite element is present under 11 U.S.C. § 523(a)(2)(A) is a factual determination. *See In re Davis*, 246 B.R. 646, 651 (10th Cir. BAP 2000) affm'd in part, vacated in part 35 Fed. Appx. 826, 2002 WL 1044832 (10th Cir.).

Defendants initially argue that a debtor must benefit from the deception, must have an actual receipt of benefits, and must have personally benefitted before there can be liability under § 523(a)(2)(A). However, this is incorrect. The Supreme Court made clear in *Cohen* that the overriding purpose of § 523 is to protect the victims of fraud, therefore, the language of this subsection - that the debt must have been "obtained by" fraud - does not require a receipt of a benefit by the debtor. *See Cohen*, 523 U.S. at 223; *Muegler v. Bening*, 413 F.3d 980, 983-84 (9th Cir. 2005). "Courts have made it clear that '[i]t is not necessary that the property or money obtained be procured for the Debtor himself. Thus, if an officer, director or shareholder of a corporation has obtained money or property for the corporation through fraud, he will not be shielded by the corporate form.'" *Warthog, Inc. v. Zaffron (In re Zaffron)*, 303 B.R. 563, 569 (Bankr. E.D.N.Y. 2004) (citations omitted). The Court finds that the Defendants obtained money from Plaintiff for the corporation by withholding premiums for group health insurance when, if fact, there was no insurance in place. Although the stated purpose for withholding the premiums was to benefit Plaintiff by providing him group health insurance, the withholding also benefitted the Company by enabling it to attract and retain employees, and thus keep the business in operation. Plaintiff consented to the withholding

because he thought he would get insurance coverage.

And, even though a personal benefit is not required, the Court finds that Defendants did benefit personally from the withholding of premiums, in the same way that the Company benefitted. Mrs. Bell testified that she used Company funds to pay expenses, including salaries. There was no testimony that she ever segregated the funds withheld from Plaintiff's paycheck, and she did not remit any of it to a health insurance provider. Instead, she used the funds to pay other bills. She and Mr. Bell continued to draw an average monthly salary of $ 7,500 during the months the funds were withheld from Plaintiff's paycheck. Thus, the Defendants did receive some benefit from withholding the premiums and not remitting them to the health insurance provider. Therefore, the Defendants and the Company benefitted from the alleged fraudulent activity.

Turning to the remaining elements of § 523(a)(2)(A), there must be a false representation or false pretenses. Failure to inform or disclose may constitute a false representation. *See Riebesell*, 586 F.3d at 791. The Court finds that Mrs. Bell falsely represented to Plaintiff and his wife that he did have health insurance coverage and that his medical bills would be paid. The evidence established that Mrs. Bell knew sometime in January that Community Care was cancelling or had cancelled health insurance, yet when Plaintiff and his wife asked her about the information from a medical provider indicating that they had no insurance coverage for Mrs. Vega's medical treatment, Mrs. Bell responded that it was a mistake and that the Company was obtaining coverage from a different company. She continued to insist that Plaintiff's bills should have been paid under both insurance policies and that she did not know why his bills were not paid despite the fact that she knew she had not caused payments to be made to the providers. When the insurance coverage was cancelled by Community Care, Mrs. Bell simply informed Plaintiff and the other employees that the

Company had lost its insurance but that they were obtaining new insurance, while continuing to withhold premiums. Each deduction for health insurance was a false representation to Plaintiff that he had insurance.

Defendants' silence and concealment of the facts regarding the group health insurance while continuing to withhold premiums also constitutes "false pretenses." *In re Asif*, – B.R. – , 2011 WL 1871144 *11 (Bankr. D. Kan. 2011); *In re Khafaga*, 419 B.R. 539, 546 (Bankr. E.D.N.Y. 2009). "[O]missions or a failure to disclose on the part of the debtor can constitute misrepresentations for purposes of nondischargeability where circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor." *Farraz v. Soliz (In re Soliz)*, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996)(citations omitted). For months Defendants concealed the fact that the Company had not paid the insurance premiums, although outwardly Mrs. Bell assured Plaintiff that he did have insurance through continuing to withhold monies from his paycheck, and through conversations with him and his wife.

The next element - intent to deceive - may be inferred from the totality of the circumstances or from a knowingly made false statement. *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996). Intent to deceive may also be demonstrated by a debtor's reckless disregard for the truth or accuracy of her representations. *Id.* at 1375. Although the Bells may not have acted with fraudulent intent when they initially withheld funds from Plaintiff's paycheck in late December of 2008, and first told him that he would have medical insurance coverage, subsequent conduct infers an intent to deceive Plaintiff or a reckless disregard for the truth. *See In re Asif*, – B.R. – , 2011 WL at *12. Mrs. Bell knew that the premiums were not being made in a timely fashion, that the Company owed a significant amount of money to Community Care and was struggling to pay its bills

as they became due, and knew within a few weeks of adding Plaintiff to the insurance policy that Community Care was going to cancel coverage. Yet, she failed to alert Plaintiff that he may not have coverage and that if he or his wife sought medical treatment their bills would not be covered. Instead, she continued to prepare the payroll to include deductions for health insurance premiums.

This Court finds that Mrs. Bell's testimony was not credible but was self-serving. Her actions and her demeanor during trial support this Court's assessment of her credibility. It stretches the credulity of this Court to believe Mrs. Bell's testimony that insurance coverage was in place when she had not paid insurance premiums. Mrs. Bell was well aware that insurance coverage could and would be terminated due to nonpayment of premiums, having experienced that consequence with Community Care. Nor does the Court believe her testimony that BCBS covered any employees' medical bills for three months without ever receiving any payment for premiums and that BCBS refused to accept a payment in April. She provided no documentary evidence to this Court that medical bills of other employees were paid, although she claimed that her daughter and son-in-law's medical bills for birth of their child was paid and that her prescription drugs were paid for by BCBS. Presumably, she offered this testimony as a way to prove that Plaintiff's medical bills were paid by BCBS (contrary to the testimony of Plaintiff and his wife and the medical bills submitted) or should have been paid so it was not her fault or responsibility that the bills were not paid. She provided no explanation as to why medical bills for her family were covered but Plaintiff's bills were not. However, she did reveal that she stopped filling her own prescriptions for two months prior to obtaining the BCBS insurance because the Company did not have coverage during those months. This indicates to the Court that Mrs. Bell knew there was no coverage in January, in spite of her insistence to the Court to the contrary. Even after she was presented with proof that Community

Care had cancelled the insurance effective December 31, 2008, she refused to refund Plaintiff the premiums withheld for that month.

She told the Court that she does not feel she lied because she tried her best to keep the Company going. However, she repeatedly withheld information from her employees and admitted to the Court that she did not inform the employees that the insurance was not in place, that the Community Care Insurance had been cancelled due to nonpayment of premiums, that she refused to refund premiums to Plaintiff until prompted to do so by the State Labor Board, that she failed to refund premiums withheld for January of 2009 even though she knew Community Care had terminated coverage effective December 31, 2008, and she made Mr. Vega responsible for the $50 stop payment charge that she ordered on the first reimbursement check she sent to him. Her testimony to the Court was contradictory. Her statement that she did not learn of BCBS's cancellation until after June 1 was contradicted by the evidence and her testimony that she issued a check to Plaintiff on June 1st to reimburse him for premiums withheld. It appears to the Court that she had knowledge of problems with insurance coverage before June 1.

She also testified that she and Mr. Bell only got paid when the Company had the money to pay them. However, financial records did not support this testimony. The records showed that Defendants were paid $ 67,000 in 2009, with approximately one-third of that coming in the first three months of the year when Plaintiff was employed, and when premiums went unpaid. Mrs. Bell represented to the Oklahoma Employment Security Commission that employees' premiums were refunded or their medical bills were paid. When asked on cross-examination whether this was a true statement, she replied that she was never given any bills to pay. To this Court, this response was evasive and disingenuous, and indicates that her statement to the Commission was misleading at

best. Her pattern of behavior indicates one who is attempting to cover her tracks, not one who is an honest person.

In addition, Mrs. Bell is a sophisticated businesswoman with years of financial experience. She did the payroll for the company, conducted all the negotiations regarding the procurement of health insurance coverage, and was intimately aware of every penny spent and bill due. Her testimony that she simply forgot that she was withholding insurance premiums from Plaintiff's and other employees' paychecks without having any insurance coverage in place or knowing if the premiums would ever be paid is not credible. Mr. Bell was an equal participant in the business according to Mrs. Bell. Therefore, based upon the totality of circumstances as well as the false representations and omissions, the Court finds that Defendants intended to deceive Plaintiff or acted in reckless disregard to the truth of their representations.

The Court also finds that Plaintiff acted in reliance upon the representations of Defendants and that he was justified in doing so. Mrs. Bell told him that he had insurance and he and his wife sought medical treatment and incurred medical expenses once the insurance was in place. Plaintiff continued to work for the Company and have premium payments deducted from his pay and justifiably presumed that he was covered under a group health insurance policy. He and his wife believed Mrs. Bell when she told them to ignore the comment from one medical provider that Plaintiff was not covered, explaining that new insurance was being obtained, and that they should not worry about the bills. Finally, Plaintiff sustained a loss as a result of Defendants' actions in this case. He lost the funds that were withheld from his paycheck from the end of December of 2008 through April of 2009, and was induced to continue to work for the Company without the benefit of insurance he paid for. He and his wife incurred medical bills that were not paid because no health

insurance coverage existed.  The Court therefore finds that Plaintiff has met his burden of proof by a preponderance of the evidence that the debt consisting of withheld premiums and unpaid medical bills should be excluded from the Defendants' discharge pursuant to § 523(a)(2)(A).

The Court does not find that the debt may be excepted from discharge pursuant to § 523(a)(6).  That subsection excepts any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."  This requires proof of a deliberate or intentional injury, not merely a deliberate intentional act that leads to injury, therefore, a defendant must intend the consequences of his actions.  *Kawaauhau v. Geiger*, 523 U.S. 57 (1998).  A "willful act" is one in which a debtor "must 'desire . . . [to cause] the consequences of his act or . . . believe [that] the consequences are substantially certain to result from it.'" *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004)(quoting *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley),* 235 B.R. 651, 657 (10th Cir. BAP 1999)).  The word "malicious" requires proof "that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause the injury."  *Moore*, 357 F.3d at 1129 (quoting *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir. 1995)).   In other words, under *Moore*, there must be an intent to do harm. Therefore, the debt must be the result of a willful and malicious act intended to do injury to a person before it can be excepted from discharge.  The Court does believe that Defendants acted willfully in withholding premiums, failing to ensure that Plaintiff had health insurance coverage, representing that insurance was in place, and that medical bills would be taken care of.  And the Court also believes that Defendants knew or should have known that denial of coverage and Plaintiff's resulting personal liability for medical bills was substantially certain to result from their actions.  However, the Court cannot conclude that Defendants acted both willfully and maliciously with an intent to

injure this Plaintiff. The actions of Defendants, although reckless, do not rise to the level required in *Geiger*.

The Court does not find that Plaintiff met his burden of proof to establish that Defendants' conduct was so outrageous as to justify an award of punitive damages. There was virtually no evidence or argument presented by Plaintiff in support of this claim. Accordingly, Plaintiff's claim for punitive damages is denied.

CONCLUSION

The Court finds Plaintiff's claim for $ 12,730.68 for medical bills not paid due to lack of health insurance coverage, as well as his claim of $ 762.83 for medical insurance premiums that were withheld from his wages should be excepted from the Defendants' discharge pursuant to 11 U.S.C. § 523(a)(2)(A). Plaintiff shall be granted a judgment of nondischargeability against the Defendants in the amount of $ 13,493.51.

A separate judgment consistent with this Opinion is entered concurrently herewith.

###